**Quirino Canedo OCHAVE and Felicitas Pagador Ochave, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 99–70739.

United States Court of Appeals, Ninth Circuit.

Submitted April 17, 2001*

Filed June 26, 2001

---

* The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App. P. 34(a)(2).

Judith L. Wood, Los Angeles, California, for the petitioners.

Mary Jane Candaux, Civil Division, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: PREGERSON, FERNANDEZ, and GRABER, Circuit Judges.

Opinion by Judge GRABER; Dissent by Judge PREGERSON.

GRABER, Circuit Judge:

Petitioner Felicitas Ochave (Felicitas) and her husband, Petitioner Quirino Ochave (Quirino), who are natives and citizens of the Philippines, sought asylum and withholding of deportation. Their claims were consolidated for hearing and denied by an immigration judge (IJ). On review, the Board of Immigration Appeals (BIA) affirmed the IJ's decision. Petitioners seek review. For the reasons that we discuss below, we deny the petition for review in part and dismiss it in part.

STANDARD OF REVIEW

We review for substantial evidence a factual determination that a peti-

tioner has failed to demonstrate eligibility for asylum. 8 U.S.C. § 1105a(a)(4). When reviewing for substantial evidence, we must uphold the IJ's findings unless the evidence not only supports, but compels, contrary findings. *INS v. Elias–Zacarias,* 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Where, as here, the BIA simply adopted the IJ's findings and reasoning, it is the IJ's decision that we review for substantial evidence. *Singh–Kaur v. INS,* 183 F.3d 1147, 1150 (9th Cir.1999); *Lopez–Reyes v. INS,* 79 F.3d 908, 911 (9th Cir.1996).

## FACTUAL AND PROCEDURAL BACKGROUND

Quirino and Felicitas Ochave, husband and wife, are natives and citizens of the Philippines. They lived with their four children in a small town in Pangasinan, a province of the Philippines.

Quirino worked as a cook on a ship. In August 1987, his ship docked in Texas. He entered the United States using a 29–day crew member's pass, and he remained here. The following month, Felicitas entered the United States on a visitor's visa. Their four children stayed in Manila with Felicitas' brother. After Felicitas' visa expired, she remained with Quirino in the United States.

In 1995, the INS initiated deportation proceedings against Quirino and, separately, against Felicitas. They admitted deportability but requested asylum, withholding of deportation, voluntary departure, or suspension of deportation. Their cases were consolidated for a hearing on the merits.

Petitioners' claims for asylum or other relief both are dependent on the claim of Felicitas. Her claim, in turn, is based on her testimony that, in 1986, she and her daughter were raped by two armed men. In her application, she asserted that the two rapists were members of a Marxist guerrilla organization, the New People's Army, and that the attack was on account of an imputed political opinion arising from her father's position as a "Municipal Counselor" in their region of the Philippines:

> My father was employed by the government in the year that the rape occurred. The two men who raped my daughter and I were members of the guerrillas who were trying to overthrow the government. Because my father had a title, "Municipal Counselor", my family was viewed as being reactionary in the Marxist eyes of the Communist guerrillas.

The application contained no information concerning why Felicitas believed that the rape was politically motivated.

At the hearing, she was asked about her reasons for believing that there was a connection and testified as follows: [1]

> Q. Do you have any notion at all of why the guerrillas might have raped you?
>
> A. Because they wanted to have leadership in the region.
>
> Q. *Why would a rape give them leadership, raping you in particular?*
>
> A. *We were coming from the market, me and my daughter. We were heading home about late afternoon. We encountered two men.*
>
> \*　　\*　　\*　　\*　　\*　　\*

---

**1.** The IJ found Felicitas' testimony at the hearing to be credible, so we take her testimony as true for purposes of this petition for review. Quirino also testified at the hearing. The IJ found that his testimony was not credi-

ble, because it differed dramatically from a number of statements in his application for asylum. Petitioners do not challenge that credibility finding on review, and we therefore do not consider Quirino's testimony.

Q. So what happened?

A. They started shouting, shouting that they wanted us so they pulled us and then the rape occurred.

Q. Did they—did they rape—tell us exactly what happened.

A. They pulled us, asked us to lie down and they told us what they want—they want to rape us. We could not do anything to be free. They proceeded to do what they wanted to do and that is what started it.

Q. After they completed raping you and your daughter, did they say anything to you?

A. Yes.

Q. What did they say?

A. *They said they are satisfied getting what they wanted to get.*

\*　　\*　　\*　　\*　　\*　　\*

Q. How did you know [the guerrillas] were in hiding?

A. They do not—they do not go to town when it's broad daylight or it's light. They only go to town when it's dawn or dusk.

Q. How do you know their comings and goings?

A. That is what is taking place there and *there is a lot of things like that.*

Q. When you say there are a lot of things like that, what are you talking about?

A. *It was not only us they had raped. There were a lot of people also who were raped.*

\*　　\*　　\*　　\*　　\*　　\*

Q. *Now, why do you think you were singled out for rape? Was it just*

*two women walking alone back from the market?*

A. *That is their job whenever dusk appears or comes they harass people.*

Q. *Okay, did these people do anything other than say they were going to rape you?*

A. *They would kill us if we would report this to the authorities.*

Q. *It was just a random act of violence?*

A. *Maybe.*

Q. Okay, and *you said that other people were also being raped and threatened?*

A. *Yes, there are occasions.*

(Emphasis added.)

Felicitas also testified that she did not know the rapists before the attack, that they did not identify themselves in any way during the attack, and that they were "people from the mountains," not from the town in which she lived. She further testified that she saw the rapists once (or not at all) after the rape, apparently without any words passing between them.[2]

After the rape, Felicitas moved from her town to Manila. She and her children lived there, without incident, for nearly a year before she came to the United States.

The IJ rejected Felicitas' application for asylum (and Quirino's derivative application), for two reasons. First, the IJ concluded that Petitioners had not established a connection between the rape and a protected ground. Although Felicitas made reference to her father's governmental position, she "did not make any connection" between that fact and the rape.

---

**2.** In her application, Felicitas stated that she had seen her attackers "everyday" after the rape. At the hearing, she recanted that statement and testified that she never had seen them again, or perhaps had seen them once, after the rape. The IJ noted the discrepancy and credited the version of events that Felicitas presented at the hearing.

Second, in the alternative, the IJ relied on Felicitas' voluntary and successful relocation to Manila as a ground for denying asylum. Because she had lived in Manila, without incident, for nearly a year before coming to the United States, the IJ concluded, Felicitas had not established a well-founded fear of future persecution in the Philippines.

Based on his conclusion that Quirino and Felicitas had failed to establish the grounds for asylum, the IJ concluded that they necessarily had failed to meet the higher standard of proof required for withholding of deportation.

Finally, with respect to suspension of deportation, the IJ found that Felicitas and Quirino had resided continuously in the United States since 1987, that they had demonstrated good moral character, that they were employed, and that they had no criminal history. The IJ also found, however, that they could not demonstrate that they would suffer "extreme hardship" if they were deported, a showing that is required under 8 U.S.C. § 1229(b). For that reason, the IJ declined to exercise his discretion to grant a suspension of deportation.

On review, the BIA affirmed the IJ's decision and adopted his findings and reasoning. The BIA granted voluntary departure and dismissed the appeal.

This timely petition for review followed.

## DISCUSSION

### A. *Jurisdiction*

■ As a threshold matter, Respondent argues that we lack jurisdiction over Felicitas' petition for review, because Petitioners filed a single petition for review in Quirino's name only. The petition for review is not part of our record on appeal and, accordingly, we cannot verify Respondent's assertion from the documents before us.

■ In any event, however, Quirino's claim for asylum is derivative of Felicitas' claim. Their applications were *consolidated* for hearing and on appeal. *Both* applications stand or fall on the question whether the rape of Felicitas and her daughter was "on account of" an imputed political opinion. Where, as here, the IJ and the BIA address spouses' applications for asylum together, we do the same on appeal. *Chand v. INS*, 222 F.3d 1066, 1069 n. 2 (9th Cir.2000). In the circumstances, Respondent's argument that the single petition for review is insufficient to confer jurisdiction over Felicitas' petition—an argument for which Respondent offers no authority—is not well taken.

### B. *Asylum*

#### 1. *Past Persecution*

At the outset, it is useful to catalogue what is *not* at issue:

(1) A husband may apply for asylum as a derivative beneficiary of his wife's application. 8 U.S.C. § 1158(b)(3).

■ (2) Rape is the kind of infliction of suffering or harm that may support a finding of past persecution, provided that the applicant demonstrates that the rape was on account of a statutorily protected ground, such as an imputed political opinion. *Lopez–Galarza v. INS*, 99 F.3d 954, 958–59 (9th Cir.1996).

(3) Petitioners bear the burden of establishing their eligibility for asylum; here, they bear the burden of establishing that the rape was "on account of" an imputed political opinion. 8 C.F.R. § 208.13(a).

(4) Felicitas testified that the rapists were Marxist guerrillas. The IJ questioned the basis for that testimony, but ultimately resolved the case on another

ground. For purposes of review, we accept Felicitas' assertion that the rapists were guerrillas.

■ (5) The IJ must consider evidence contained in Felicitas' application for asylum. Testimony is not required; an applicant may rest on her application, if she swears at the hearing that the contents of the application are true. *Grava v. INS*, 205 F.3d 1177, 1180 (9th Cir.2000).

■■ (6) Asylum generally is not available to victims of civil strife, unless they are singled out on account of a protected ground. To put it another way, "persecution on account of political opinion ... can[not] be inferred merely from acts of random violence by members of a village or political subdivision against their neighbors who may or may not have divergent ... political views." *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997).

■ What *is* at issue is a narrow question: Whether, considering the whole record, the IJ's finding that the evidence failed to establish a nexus between the rape and a protected ground is supported by substantial evidence. We answer that question "yes," for two reasons.

(a) *There is no evidence that the rapists imputed a political opinion to Felicitas.*

Petitioners assert that the rape of Felicitas and her daughter was "on account of" a political opinion that the guerrillas imputed to Felicitas, based on her father's position as Municipal Counselor. The only evidence in the record supporting that assertion is the statement in Felicitas' application for asylum, which we repeat here:

My father was employed by the government in the year that the rape occurred. The two men who raped my daughter and I were members of the guerrillas who were trying to overthrow the gov-

ernment. Because my father had a title, "Municipal Counselor", my family was viewed as being reactionary in the Marxist eyes of the Communist guerrillas.

We consider that statement together with the testimony at the hearing in determining whether the IJ's finding—that Petitioners failed to demonstrate the required nexus between the rape and a protected ground—was supported by substantial evidence.

■ Petitioners do not argue that Felicitas was persecuted because she actually held or had expressed a political opinion that was offensive to the guerrillas. They argue only that the guerrillas imputed reactionary opinions to her, and to all other members of her family, because her father worked for the government. "An imputed political opinion is a political opinion attributed to the applicant by his persecutors." *Sangha*, 103 F.3d at 1489. To demonstrate that persecution was "on account of" an imputed political opinion, an applicant first must show that her persecutors actually imputed a political opinion to her at the time they persecuted her.

The only evidence of imputed political opinion in this case is the statement, from Felicitas' application, that "my family was viewed as being reactionary in the Marxist eyes of the Communist guerrillas." Accepting that statement as true, there remains an insurmountable difficulty for Petitioners: There is no evidence to suggest that the rapists knew who Felicitas was— much less that they knew who her father was—at the time they raped her and her daughter. The uncontroverted evidence is that: (1) Felicitas never had seen the rapists before the attack; (2) the rapists did not identify her by name; (3) the rapists did not mention her father or any other member of her family or refer to politics, even obliquely, before, during, or after the

rape; (3) the rapists were not from her town; (4) the rape took place outdoors, on the way back from the market, rather than in a place (like Petitioners' home or place of work) that would suggest that the rapists were seeking Felicitas and her daughter specifically; (5) the rapists routinely came down from the mountains at dusk and "harass[ed] people," and rapes by guerrillas happened to "a lot of people"; and (6) the guerrillas did not continue to harass Felicitas after the rape, or communicate with her in any way, so as to suggest that this was a purposeful attack with a political motive, rather than a despicable act of unmotivated violence against a stranger.

Whether or not the guerrillas in the New People's Army believed, as a general matter, that the family of a Municipal Counselor was reactionary, the fact remains that there is nothing in this record even to hint that the rapists knew, at the time of the rape, that Felicitas and her daughter were members of that reactionary family. By contrast, in cases in which this court has found that rapes occurred "on account of" an imputed political opinion, the evidence was clear that the rapists (1) knew the specific identity of their victims; and (2) imputed political opinions to those victims. For example, in *Lopez–Galarza*, the victim's neighbor accused her of "supporting the counter-revolutionary contras"; as a result, she was arrested, imprisoned, and raped. 99 F.3d at 957. In *Lazo–Majano v. INS*, 813 F.2d 1432, 1433 (9th Cir.1987), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955 (9th Cir.1996) (en banc), the victim worked for the rapist, "who had known her since childhood," and the rapist stated during the rape that the attack was on account of the political activities of the victim's husband.

As our previous cases illustrate, in order to impute a political opinion to his victim on account of her family's activities, a rapist necessarily must have some idea who the victim is. That crucial fact—which is a logical predicate to Felicitas' entire claim—is not established anywhere in this record, including her application.

### (b) *There is affirmative evidence suggesting that the rape was a random act of violence.*

Even were we to conclude that the rapists imputed reactionary political opinions to Felicitas, the IJ's finding that the rape was not "on account of" such opinions still would be supported by substantial evidence. When we consider the record as a whole, there is evidence that the attack was *not* politically motivated. As detailed above, Felicitas testified that the guerrillas, unfortunately, raped others as well when they ventured into town from the mountains and that the attack might have been a random act of violence. The rapists were not from her town and did not know Felicitas. They said nothing to her about politics or her father before, during, or after the rape.

We do not question the horrific nature of what Felicitas and her daughter suffered. Nor do we question the sincerity of Felicitas' subjective belief, stated in her application, that the rape was politically motivated. But we cannot conclude that the IJ was compelled to accept the accuracy of her belief, because there is substantial evidence tending in the other direction. In the circumstances, our standard of review dictates the result.

In summary, because we are not compelled to find on this record that Petitioners established a connection between the rape and a protected ground, we must

uphold the denial of their petition for asylum.[3]

### C. *Sufficiency of the Record*

 Petitioners argue on review that the IJ violated their due process rights by frustrating counsel's attempts to have Felicitas explain the circumstances of the rape. We lack jurisdiction to review that claim, because Petitioners did not raise it before the BIA. "Failure to raise an issue in an appeal to the BIA constitutes a failure to exhaust remedies with respect to that question and deprives this court of jurisdiction to hear the matter." *Vargas,* 831 F.2d at 907–08.

We observe, nonetheless, that most of the questions as to which the IJ sustained or interposed objections pertained to the identity of the rapists as guerrillas. That fact is established elsewhere in the record, and we accept it as true.

 The significant exception was the IJ's decision to sustain an objection[4] to the following question during Felicitas' testimony on direct examination:

> Q: Was any mention of your father made during the rape?

Both before and after that question, Felicitas gave detailed accounts of the rape in response to open-ended questions. She was asked at least twice what the rapists said, and in her answers did not mention her father or politics.

Additionally, Felicitas had an opportunity to explain the reason for the rape, in response to at least three open-ended questions. In responding to those open-ended questions, Felicitas did not mention her father, or his political opinions, or any political opinions that the rapists might have imputed to her.

In sum, Felicitas had several opportunities both to testify about what the rapists said to her and to explain why she believed, at the time she submitted her application for asylum, that the rape was "on account of" an imputed political opinion. In the circumstances, we could not conclude that the IJ erred in directing her not to answer the above-quoted leading question, even if Petitioners *had* raised this issue before the BIA.

### D. *Future Persecution*

 Felicitas moved to Manila after she was raped. She and her children lived there, without incident, for nearly a year before coming to the United States. As noted, the IJ relied on Felicitas' successful relocation as an alternate ground for denying asylum.

"[T]he reasonableness of an applicant's ability to relocate in his or her home country may be considered in the Attorney General's discretion in granting or denying asylum as a form of relief." *Singh v. Ilchert,* 63 F.3d 1501, 1511 (9th Cir.1995); *see also, e.g., Aguirre–Cervantes v. INS,* 242 F.3d 1169, 1180 (9th Cir.2001) (in holding that the INS had failed to rebut the presumption of future persecution, the court stated that "the record does not contain any evidence that the petitioner could reasonably relocate within Mexico").

Here, the unrebutted evidence is that Felicitas and her family not only could, but

---

**3.** Petitioners argue for the first time on review that the rape was "on account of" Felicitas' membership in the "social group of women of her nationality." We lack jurisdiction to review that issue, because Petitioners did not raise it before the BIA. *Vargas v. INS,* 831 F.2d 906, 907–08 (9th Cir.1987).

**4.** The objection was made on the grounds that the question was leading and that the topic already had been covered.

did, relocate successfully within the Philippines. Petitioners do not challenge the IJ's alternate ground for denial on review. That alternate ground for denial is supported by substantial evidence.[5]

### E. *Withholding of Deportation*

■ The standard for withholding of deportation is more stringent than the standard for asylum. Because Petitioners do not satisfy the standard for asylum, they necessarily fail to satisfy the standard for withholding of deportation. *Ghaly v. INS*, 58 F.3d 1425, 1429 (9th Cir.1995).

### F. *Suspension of Deportation*

The Attorney General has discretion to grant an alien's application for suspension of deportation if the alien satisfies the "continuous physical presence," "good moral character," and "extreme hardship" requirements of 8 U.S.C. § 1229(b). Here, the IJ denied Petitioners' request for suspension of deportation on the ground that they had not satisfied the requirement of "extreme hardship."

■ Because Petitioners' cases commenced before April 1, 1997, and the final order of deportation was entered on May 26, 1999, their requests for suspension of deportation are governed by the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996). *Kalaw v. INS*, 133 F.3d 1147, 1150 (9th Cir.1997). Section 309(c)(4)(E) of the IIRIRA, which is part of the transitional rules, states that "there shall be no appeal of any discretionary decision under ... section 244 of the Immigration and Nationality Act." That provision "operate[s] to remove direct judicial review of BIA determinations of 'extreme hardship.'" *Kalaw*, 133 F.3d at 1152.

Accordingly, we lack jurisdiction to review the IJ's finding that Petitioners would not suffer extreme hardship if returned to the Philippines.

### G. *Voluntary Departure*

Although it ordered deportation, the BIA granted Petitioners the opportunity for voluntary departure. Respondent does not challenge that ruling, so it will remain in effect.

### CONCLUSION

The findings that we have jurisdiction to review are supported by substantial evidence. However, we do not have jurisdiction to review the decision regarding suspension of deportation. Therefore, the petition for review is

---

**5.** The INS has promulgated a new administrative rule, effective January 5, 2001, which amends its regulations concerning future persecution. The amended rule states that the INS may rebut the presumption of future persecution by showing by a preponderance of the evidence (1) that country conditions have changed or (2) that the applicant "could avoid future persecution by relocating to another part of the applicant's country of nationality ... and, under all the circumstances, it would be reasonable to expect the applicant to do so." Asylum Procedures, 65 Fed.Reg. 76,121, 76,133 (Dec. 6, 2000) (to be codified at 8 C.F.R. §§ 208.13(b)(1)(i)(A) & (B), 208.13(b)(1)(ii)).

Petitioners' hearing was held before the effective date of that rule. If the rule applies on review, it bolsters the argument that Felicitas' successful relocation rebuts the presumption of future persecution. This court has applied the amended rule in a case like this one, where the hearing took place before the rule's effective date. *See Aguirre–Cervantes*, 242 F.3d at 1179–80. However, the court applied the rule in that case without explicitly addressing the question whether the rule could be applied on review when the hearing occurred before its effective date. Nor need we address that question here, because we resolve the petition on another ground.

DENIED in part and DISMISSED in part.

PREGERSON, Circuit Judge, dissenting:

The inquiry in this case is whether the Immigration Judge's decision is supported by substantial evidence. In my opinion, it is not. The statements in Felicitas Ochave's asylum application, combined with her credible testimony at the hearing, compel the opposite conclusion: that Felicitas Ochave has established eligibility for asylum based on past persecution.[1] Accordingly, I dissent.

An applicant who shows that she was persecuted "on account of" imputed political opinion has stated a claim for asylum.[2] As the majority correctly states, "imputed political opinion is a political opinion attributed to the applicant by his persecutors." *Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir.1997). A rape victim seeking to prove that she was attacked "on account of" imputed political opinion "must present some evidence, *direct or circumstantial,* of the persecutor's motive." *Lopez–Galarza v. INS*, 99 F.3d 954, 959 (9th Cir.1996) (emphasis added).

The evidence presented by Felicitas in the declaration attached to her asylum application satisfies this standard.[3] In her

---

1. "Eligibility for asylum may be based on past persecution alone." *Acewicz v. INS*, 984 F.2d 1056, 1062 (9th Cir.1993) (citing *Matter of Chen*, Int. Dec. 3104 at 4 (BIA 1989)). Where the applicant can show she has in the past "suffered under atrocious forms of persecution," the applicant is eligible for asylum even if "there is little likelihood of future persecution." *Id.* (citation and internal quotation marks omitted). In such cases, the court need not reach "factual questions that relate to the political climate of [the native country] as it may impact the likelihood of future persecution" to grant the petition for asylum. *Lopez–Galarza v. INS*, 99 F.3d 954, 959 (9th Cir.1996).

2. To establish eligibility for asylum based on past persecution, an applicant must show three things: (1) what happened to her rises to the level of persecution; (2) the persecution was committed either by the government or by forces that the government was unable or unwilling to control; and (3) the persecution was "on account of" a statutorily protected ground. *Chand v. INS*, 222 F.3d 1066, 1073 (9th Cir.2000). The record demonstrates that Felicitas has satisfied each of these requirements.

 There is no question that rape inflicts suffering sufficient to support a finding of past persecution. *Lopez–Galarza,* 99 F.3d at 959 (citation omitted). Nor is there any question that the men who raped Felicitas were members of the New People's Army ("NPA"), a militant guerrilla group that the Philippine government was unable to control. *Borja v.*

*INS*, 175 F.3d 732, 734 (9th Cir.1999) (en banc) ("The New People's Army ('NPA') is a violent, revolutionary Communist group which actively opposes the Philippine government. The NPA has a well-documented history of political violence, including the murder of its opponents.").

 Because the majority does not dispute that Felicitas has met the first two elements of her asylum claim, I discuss only the third: whether Felicitas has established a nexus between the persecution she suffered and a statutorily protected ground.

3. As the majority correctly notes, Felicitas's asylum application and attached supporting declaration, standing alone, are sufficient to establish that she is entitled to asylum based on past persecution. 8 C.F.R. § 240.49(c)(4)(iii). We have observed that "an [asylum] applicant need not testify on his or her own behalf ... and *may rest on the application alone,* subject to INS examination at the hearing." *Grava v. INS*, 205 F.3d 1177, 1180 (9th Cir.2000) (emphasis added). Indeed, we have held that credible asylum applications may be more probative than an applicant's testimony before the Immigration Judge. While "either the applicant or the government may desire additional oral testimony to bolster or dispute credibility," the evaluation of an asylum claim is not limited to hearing testimony alone. *Id.* at 1181. "Given the difficulties many applicants face at their hearings, ranging from translation difficulties to the overwhelming anxiety of facing

sworn statement, which the Immigration Judge found to be credible, Felicitas declared that:

> I was raped in 1986 in the Philippines and both my daughter and I suffered tremendously as a result of this event. My daughter was also raped, at the same time.... *My father was employed by the government in the year that the rape occurred. The two men who raped my daughter and I were members of the [NPA] guerrillas who were trying to overthrow the government. Because my father had the title "Municipal Counselor," my family was viewed as being reactionary in the Marxist eyes of the Communist guerrillas* .... I think I might be found by the men who raped me and I fear that they might try to kill me for having divulged their awful secret to the world. The Philippine government has little or no control over the communist[ ] guerrillas who terrorize the people and the people have become a victim in the struggle for power.

(emphasis added).

The majority finds that the statement excerpted above fails to establish a nexus between the rape and Felicitas's father's political opinion. According to the majority, Felicitas's declaration is insufficient because "[t]here is no evidence to suggest that the rapists knew who Felicitas was—much less that they knew who her father was—at the time they raped her and her daughter." This conclusion suggests that Felicitas could satisfy her burden of proof only by testifying that the rapists explicitly informed her—before, during, or after raping her—that she had been singled out because of her father's political position. We have never held that an asylum appli-

deportation, *the asylum application sometimes represents an alien's best case." Id.* (citing

cant must satisfy this impossible evidentiary standard.

The majority also cites Felicitas's testimony at the deportation hearing as providing an additional basis for rejecting her asylum claim. Specifically, the majority concludes that "Felicitas had an opportunity to explain the reasons for the rape in response to open-ended questions" at the hearing and failed to do so. This conclusion ignores two critical facts. First, Felicitas's testimony at the hearing—which the Immigration Judge found credible—corroborated the statements she made in her asylum application. Felicitas testified that she and her daughter were raped by guerrillas, and she explained that the rape occurred because "they wanted to have leadership in the region." Felicitas also testified that she told her father, a government official, about the rape. The Immigration Judge, in stating the basis for his favorable credibility finding, observed that: (1) Felicitas's testimony was "generally consistent with the information provided in her asylum application"; (2) Felicitas had been subjected to "extensive cross examination," and (3) she "had a good recollection of dates and time-frames for various incidents."

Second, the majority's conclusion that Felicitas failed to give a sufficiently detailed explanation of the events surrounded her rape at the deportation hearing ignores the fact that the INS attorney and the Immigration Judge repeatedly prevented her from answering questions designed to elicit that information.

> **Counsel:** How did you know these men [who raped you] were guerrillas?
>
> **INS Attorney:** Objection, Your Honor. That's a leading question

*Matter of Fefe,* 20 I. & N. Dec. 116 (BIA 1989)) (emphasis added).

IJ: Objection sustained. . . .

Counsel: Was any mention of your father made during the rape? . . . .

INS Attorney: Objection, leading.

IJ: Do not answer the question. Strike the question, strike the answer and rephrase.

Counsel: Did you tell anyone about the rape?

IJ: Strike the question and strike the answer. It's a leading question. Rephrase. . . .

Counsel: Did you think that these two men [who raped you] were part of the guerrillas?

IJ: Strike the question. It's a leading question. It's a very ·critical question. Rephrase the question.

Counsel: Did you have any idea who these two men [who raped you] were?

IJ: Do not answer the question. It's a leading question. I again caution counsel to rephrase. You're putting words in the mouth of the respondent. Rephrase, please.

Counsel: If you know, did these men have any kind of affiliation with anyone?

INS Attorney: Objection. That's leading as well, Your Honor.

IJ: Objection sustained.[4]

Counsel: When you say that other people were raped by the guerrillas, how did you know that?

INS Attorney: Objection. That's misstating testimony, Your Honor.

IJ: Objection sustained. It is misleading testimony. Do not answer the question, ma'am.

The Immigration Judge's multiple, sua sponte objections to Felicitas's counsel's open-ended questions as "leading" and his sustaining similar objections from the INS attorney effectively frustrated Felicitas's ability "to present directly, or fully detail, her account supporting her claim for asylum." *Jacinto v. INS*, 208 F.3d 725, 732 (9th Cir.2000); *see also Chand*, 222 F.3d at 1075 ("The Immigration Judge had a duty, shared with [the applicant], to ascertain the information relevant to the asylum claim and to aid in the development of the record.").[5]

In this case, the Immigration Judge reviewed Felicitas's asylum application,

---

4. THE IMMIGRATION JUDGE, IN MAKING SUA SPONTE OBJECTIONS AND SUSTAINING THE OBJECTIONS OF THE INS ATTORNEY, CHARACTERIZED COUNSEL'S QUESTIONS AS "LEADING." IN MY OPINION, THESE OBJECTIONS WERE NOT WELL–TAKEN. A LEADING QUESTION IS "[A] QUESTION THAT SUGGESTS THE ANSWER TO THE PERSON BEING INTERROGATED." BLACKS LAW DICTIONARY 897 (7th ed.1999). None of the questions that Felicitas was asked by her attorney were sufficiently specific or obvious as to "suggest the answer."

5. "[T]he role of the asylum adjudicator is to 'ensure that the applicant presents his case as fully as possible and with all available evidence.'" *Jacinto*, 208 F.3d at 732–33 (quoting the UNHCR Handbook on Procedures and Criteria for Determining Refugee Status under the Refugee Convention ¶ 196). To fulfill this obligation, the Immigration Judge is empowered to "interrogate, examine, and cross-examine the alien and any witnesses." *Shoafera v. INS*, 228 F.3d 1070, 1075 (9th Cir.2000) (quoting 8 U.S.C. § 1229a(b)(1)). Although the majority correctly concludes that we lack jurisdiction to review Felicitas's due process claim, it is worth noting that we have found a due process violation where an Immigration Judge denied an applicant the opportunity to present relevant evidence regarding her asylum claim, because the Immigration Judge's action ensured that "information crucial to [her] future remain[ed] undisclosed." *Jacinto*, 208 F.3d at 733.

which stated clearly the statutory basis for her claim. Indeed, he found Felicitas's hearing testimony credible in part because it was "consistent with the information provided in her asylum application." At the hearing, he had the opportunity to interrogate, examine, and cross-examine Felicitas to probe the assertions in her application regarding the nexus between her rape and her father's political beliefs. The Immigration Judge did not take that opportunity. What is more, he blocked Felicitas's counsel's efforts to bring out crucial information in the application regarding the nexus between the rapes and the political position held by Felicitas's father in the Philippine government. We have held that where an Immigration Judge fails to "elicit[ ] any testimony from [the applicant] demonstrating that the nature or basis for her testimony was questionable," he cannot summarily dismiss her credible testimony as incomplete or speculative. *Shoafera v. INS,* 228 F.3d 1070, 1075 (9th Cir.2000).

While I think it is important to highlight the reasons behind any perceived gaps in Felicitas's testimony at her hearing, I do not believe that those perceived gaps undermine the validity of her asylum claim. The statements in Felicitas's asylum application, combined with her credible hearing testimony, establish that she was raped by guerrillas on account of her father's political beliefs, which they imputed to her.

Because I think the record compels the conclusion that Felicitas suffered past persecution on account of imputed political opinion, I would reverse the decision of the Immigration Judge and find that Felicitas is eligible for a discretionary grant of asylum.