**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MAIKAL ALI ISKANDAR HALIM,
                *Petitioner,*

       v.

ERIC H. HOLDER JR., Attorney
General,

              *Respondent.*

No. 04-74868

Agency No.
A075-745-174

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 14, 2009—Seattle, Washington

Filed December 30, 2009

Before: Richard D. Cudahy,* Senior Circuit Judge,
Johnnie B. Rawlinson and Consuelo M. Callahan,
Circuit Judges.

Opinion by Judge Callahan;
Concurrence by Judge Cudahy

---

*The Honorable Richard D. Cudahy, Senior United States Circuit Judge
for the Seventh Circuit, sitting by designation.

16889

## COUNSEL

Sharon A. Healey, Law Office of Sharon A. Healey, Seattle, Washington, for the petitioner.

Tony West, Assistant Attorney General, Janice K. Redfern, Thankful T. Vanderstar and Anna E. Nelson (argued) of Washington, D.C., for the respondent.

## OPINION

CALLAHAN, Consuelo:

Maikal Ali Iskandar Halim ("Halim") seeks review of the denial of his claims for asylum, withholding of removal, and

relief under the Convention Against Torture ("CAT") based on his fear of being persecuted due to his Chinese ethnicity should he return to Indonesia. We affirm the denial of relief because we conclude that Halim has not made a compelling showing that (1) the reported incidents of discrimination amount to persecution, (2) the incidents provide an objective basis for a well-founded fear of future persecution, or (3) he is a member of a disfavored group who has been individually targeted.

I

Halim alleges that he was born in 1975 in Indonesia. He is ethnically Chinese and was baptized in the Catholic Church. In support of his assertion that he has experienced harassment throughout his life in Indonesia because he is ethnically Chinese, he related the following incidents.

In 1988, his father enrolled him in a junior high in which he was one of only two non-Muslims. One day when it was raining heavily, some of the students stripped him naked and ordered him to run around the volleyball court. Although he begged for help, the students laughed at him and mocked him because of his race. After about five or ten minutes his clothing was returned to him. Halim claims that this incident was so humiliating that he never told anyone about it, not even his parents.

In 1991, he was enrolled in a Catholic high school which required that its students wear a distinctive uniform. Halim alleges that when he used public transportation wearing his school uniform, he was mistreated by students because of his religion and his race. One afternoon in 1992, when Halim and a friend were waiting for public transportation, a bus crowded with students passed by and one of the students spat in his face. A number of students then got off the bus and came toward Halim and his friend with the intent of beating them up. Halim and his friend ran back to the school where the

principal tried to calm the pursuing students. Halim claims that there was a policeman standing not very far away who saw what happened but did not try to stop the students from attempting to beat up Halim.

Halim's mother claims that when Halim was 20 years old he had bad diarrhea and she took him to a government-owned clinic. She alleged that the clinic refused to treat him because he was Chinese and told her "you are Chinese and should have lots of money. Why don't you take your son to a private clinic or hospital?"

Halim represents that sometime in 1995 or 1996, when he was riding in a car in a park around midnight with a friend who is also ethnic Chinese, he was stopped by a team of police checking for drugs. They were forced to get out, were arrested, and placed in a police truck, which Halim claims contained other ethnic Chinese who had been arrested, but no Muslim Indonesians. At the police station, Halim was told that they had found drugs in the car, but no charges were ever filed. Halim was released after three days when his father came to the station and paid a bribe.

In 1998, riots broke out in Indonesia. Halim described what happened to him as follows:

> I was attending university, on May 12, 1998, the university decided to stop all the activities on campus and let everyone went [sic] home. But, the natives started blocking the streets. I was on my motorcycle when the native mobs forced me to take off my helmet. As soon as they saw my face and knew that I was Chinese, they started beating me up. I was rescued when the army came to disperse the mobs. I was able to just make it home even with my horrible physical condition and damaged motorcycle. Because it was so dangerous for Chinese to be seen on the street, I did not see a doctor.

Halim's father died in September 1998 of a heart attack and in 1999 his mother and brother came to the United States. Halim continued to work and attend university. In May 2000, another riot broke out in Indonesia against the Chinese. Although he was not personally attacked, the riot convinced Halim that Indonesia was not a safe place. Around August 2000, Halim came to the United States.

## II

In January 2001, Halim applied for asylum, withholding of removal and protection under CAT. An asylum officer issued an order finding that Halim had not established eligibility for asylum and referred the matter to an immigration judge ("IJ"). Removal proceedings were commenced, and following a hearing, the IJ issued an oral decision finding Halim removable. The IJ denied him asylum, withholding of removal, and relief under the CAT.

The IJ noted that Halim had "testified to a general pattern of acts of harassment taken against him" because of his Chinese ethnicity, but commented that there were only "two significant events that require discussion." These were the 1988 incident in junior high school when Halim was stripped naked and the May 1998 incident when he was beaten by a mob of rioters. The IJ noted that after the 1998 incident, Halim went back to the university and worked to earn money until he was able to obtain a visa to come to the United States in August 2000. The IJ stated that he did not condone these acts of harassment and physical assault, but implicitly held that such acts did not amount to persecution.[1]

---

[1] The IJ cited *Rostomian v. INS*, 210 F.3d 1088, 1089 (9th Cir. 2000) (holding that knife wounds sustained by petitioner during an Azeri attack on the Armenian residents of a border town was "an act of random violence during a period of significant strife" despite a recognition "that old animosities between Azeris and Armenians still exist") and *Ochave v. INS*, 254 F.3d 859, 865-66 (9th Cir. 2001) (holding that rape by guerillas during period of civil strife was not persecution for political opinion absent evidence that attackers knew the identity of the victim and imputed a political opinion to her).

The IJ noted, but discounted, Halim's claim that "he was greatly traumatized by the pattern of harassment and discrimination that he sustained in Indonesia." The IJ found that the testimony had been embellished and was not credible.[2] He noted that despite Halim's claim of trauma, he had been able to continue to study in Indonesia and had been working in the United States since 2001 with computers and graphic designs. The IJ opined that this was "a demanding field" and "would certainly be inconsistent with the generalized claim that the trauma he sustained from growing up in Indonesia has had such a devastating impact on him." In addition, the IJ noted that Halim has a sibling who has remained in Indonesia, attends church, has a "significant job." There was no indication of any particular incidents against the sibling. Finally, the IJ observed that Halim claimed that he was not involved in political activity and had no problems obtaining a passport and leaving the country.

The IJ denied Halim relief, but granted him the privilege of voluntary departure. Halim appealed to the Board of Immigration Appeals ("BIA"), which affirmed the IJ's decision without an opinion. Halim then filed a timely petition for review of the BIA's order by this court.[3]

### III

Where, as here, the BIA affirms an IJ's decision without an

---

[2]The IJ noted that:

> [T]he respondent and especially the mother, when she testified, made sweeping statements that because she and her family were of Chinese ethnicity, that they could not get any kind of protection from the government or its authorities. Yet, as noted, the respondent himself states that during the course of the only significant violence directed at him, "I was rescued when the army came to disperse the mob."

[3]Halim's proceeding in this court was stayed pending our decision in *Lolong v. Gonzales*, 484 F.3d 1173 (9th Cir. 2007) (en banc).

opinion, we review the IJ's decision as if it were the BIA's decision. *De Mercado v. Mukasey*, 566 F.3d 810, 814 n.1 (9th Cir. 2009) (citing *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 849 (9th Cir. 2003)); *see also Renteria-Morales v. Mukasey*, 551 F.3d 1076, 1081 (9th Cir. 2008) (noting that "where the BIA summarily affirms the holding of the IJ without opinion, we review the IJ's decision as the final agency determination"). Legal determinations are reviewed de novo. *Sandoval-Lua v. Gonzales*, 499 F.3d 1121, 1126-27 (9th Cir. 2007). The substantial evidence standard governs adverse credibility findings and all other factual findings. *See Zehatye v. Gonzales*, 453 F.3d 1182, 1185 (9th Cir. 2006); *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001). "Under the substantial evidence standard, 'administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.' " *Zehatye*, 453 F.3d at 1185 (quoting 8 U.S.C. § 1252(b)(4)(B)). "[W]e must uphold the IJ's determination if it is supported by reasonable, substantial, and probative evidence in the record." *Id.* (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

IV

On appeal, Halim essentially raises three issues: (1) whether the IJ's conclusion that Halim's reported incidents of harassment do not constitute persecution is supported by substantial evidence; (2) whether the IJ's conclusion that Halim does not have a well-founded fear of future persecution is supported by substantial evidence; and (3) whether Halim is entitled to relief or a remand on the basis of his disfavored group claim.

   A.   *Halim's evidence, even if credited, does not compel a finding of past persecution.*

**[1]** An applicant bears the burden of establishing that he or she is eligible for asylum. 8 C.F.R. § 208.13(a); *see also Zhu v. Mukasey*, 537 F.3d 1034, 1038 (9th Cir. 2008). Although

the term "persecution" is not defined by the Immigration and Nationality Act, "[o]ur caselaw characterizes persecution as an extreme concept, marked by the infliction of suffering or harm . . . in a way regarded as offensive." *Li v. Ashcroft*, 356 F.3d 1153, 1158 (9th Cir. 2004) (en banc) (citation and internal quotation marks omitted). In *Wakkary v. Holder*, 558 F.3d 1049 (9th Cir. 2009), we noted that "[p]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive . . . mere discrimination, by itself, is not the same as persecution." *Id*. at 1059 (citations and internal quotation marks omitted).

**[2]** Here, even taking Halim at his word, he has failed to present evidence that compels a finding of past persecution. He alleges only five instances of mistreatment: (1) in 1988, he was stripped naked by students when he was in junior high; (2) in 1992, while in high school, he was spat upon and threatened by Indonesian students; (3) in 1995, when his mother took him to a government clinic because he had severe diarrhea, the clinic refused to see him, telling his mother that because they were Chinese they had money and should go to a private doctor; (4) in 1995 or 1996, he was arrested and detained for a couple of days when police stopped the car he was riding in around midnight and claimed that they had found drugs in the car; and (5) in 1998, he was beaten by a mob of rioters because he appeared to be Chinese, but was rescued when the army broke up the riot. These claims simply do not compel a finding of past persecution. In *Wakkary*, we held that a very similar set of allegations by an ethnically Chinese Indonesian did not amount to past persecution.[4] 558 F.3d

---

[4]We held:

> Wakkary's personal experiences at the hands of native Indonesians — being beaten by youths and robbed of his sandals and pocket money in 1985 and 1990 (seventeen and twelve years, respectively, before he filed his asylum application), and being accosted by a threatening mob while his family was driving to Bible school in 1998 — are instances of discriminatory mistreat-

at 1059-60. *See also Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 (9th Cir. 2003) (holding that lifetime of harassment and a one-time beating experienced by Hoxha, an ethnic Albanian, while living in Kosovo did not amount to past persecution). In light of these decisions, we conclude that Halim has failed to make a compelling showing of past persecution.

**[3]** His showing is further undermined by the IJ's adverse credibility finding. The record supports the IJ's determination that Halim and his mother embellished their claims that the Indonesian government would not and could not provide Indonesians of Chinese ethnicity protection. Also, although Halim's experience with incidents of discrimination were undoubtedly traumatic, the record supports the IJ's determination that Halim exaggerated their impact.

B.   *Halim's evidence does not compel a well-founded fear of future persecution.*

**[4]** In the absence of past persecution, an applicant may still be eligible for asylum based on a well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(b). A well-founded fear "must be both subjectively genuine and objectively reasonable." *Ahmed v. Keisler*, 504 F.3d 1183, 1191 (9th Cir. 2007) (quoting *Sael v. Ashcroft*, 386 F.3d 922, 924 (9th Cir. 2004)). Where, as here, a person has not demonstrated past persecution, he or she may still show "a good reason to fear future persecution by adducing credible, direct, and specific evidence in the record of facts that would support a reasonable fear of persecution." *Id.* (citation and internal quotation marks omitted). "The objective requirement can be met either through the production of specific documentary evidence or

_____

ment. We cannot say, however, that a reasonable factfinder would be "compel[led]" to conclude that these experiences, without more, cumulatively amount to past persecution.

*Wakkary*, 558 F.3d at 1059-60 (citations omitted) (alteration in original).

by credible and persuasive testimony." *Ladha v. INS*, 215 F.3d 889, 897 (9th Cir. 2000), *overruled on other grounds by Abebe v. Mukasey*, 554 F.3d 1203, 1208 (9th Cir. 2009) (en banc) (per curiam) (internal citations and quotation marks omitted). "A well-founded fear does not require certainty of persecution or even a probability of persecution." *Hoxha*, 319 F.3d at 1184. "[E]ven a ten percent chance of persecution may establish a well-founded fear." *Al-Harbi*, 242 F.3d at 888. The "objective circumstance[s] must be determined in the political, social and cultural milieu of the place where the petitioner lived." *Montecino v. INS*, 915 F.2d 518, 520 (9th Cir. 1990).

**[5]** The record does not compel a finding of even a ten percent chance of persecution. With the exception of his detention in 1996 allegedly for drug possession, Halim does not assert any incident of persecution by the government. Indeed, it was the army that saved him when he was attacked by rioters in 1998. Halim alleged no persecution by the government between the 1996 incident and his departure from Indonesia in 2000. Also, it does not appear that Halim reported any of the earlier incidents to the government, so there is little in this record to suggest that the government cannot or will not provide him protection.

**[6]** Furthermore, we recently rejected similar claims by Indonesians of Chinese ethnicity. *See Lolong*, 484 F.3d at 1179 (noting that despite evidence of "some anti-Chinese discrimination" the government of Indonesia has shown its commitment to freedom of religion and "lack of institutional discrimination"); *see also Wakkary*, 558 F.3d at 1061 (noting that the record "does not compel the conclusion that there exists a pattern or practice of persecution against Chinese and Christians in Indonesia"). These decisions support our determination that Halim has failed to make a compelling showing of the requisite objective component of a well-founded fear of persecution.

C. *Halim is not entitled to relief or remand based on his claim of being a member of a "disfavored group."*

**[7]** We have recently recognized that a petitioner may show a well-founded fear of persecution based on membership in a disfavored group. In *Sael*, we explained that even when an applicant could not show past persecution, an applicant could demonstrate a well-founded fear of future persecution in one of two ways:

> Under the first approach, the applicant relies on establishing "a pattern or practice of persecution of people similarly situated" . . . . Alternatively, an applicant may prove that she is a member of a "disfavored group" coupled with a showing that she, in particular, is likely to be targeted as a member of that group . . . . The latter claim consists of two elements — membership in a "disfavored group" and an individualized risk of being singled out for persecution — that operate in tandem. Thus, the "more serious and widespread the threat" to the group in general, "the less individualized the threat of persecution needs to be."

386 F.3d at 925 (internal citations omitted).

**[8]** Most recently in *Wakkary*, we explained our disfavored group analysis as follows:

> The "singled out" path is not reserved solely for those applicants whose would-be persecutors seek them out personally, by name. Rather, *Kotasz* [*v. INS*, 31 F.3d 847 (9th Cir. 1994)] recognized that one's chances of being singled out from the general population and subjected to persecution is often strongly correlated with the frequency with which others who share the same disfavored characteristics are mistreated and persecuted.

So, in a case in which the asylum applicant attempts to show that he faces a reasonable likelihood of being singled out individually on account of a protected characteristic, "[p]roof that the government or other persecutor has discriminated against a group to which [he] belongs is . . . *always* relevant," because that proof says something about the chances that he, as a member of that group, will be persecuted. *Id.* Based on this common-sense evidentiary proposition, *Kotasz* held that once an applicant establishes that he is a member of a group that is broadly disfavored, "the more egregious the showing of group persecution — the greater the risk to *all* members of the group — the less evidence of *individualized* persecution must be adduced" to meet the objective prong of a well-founded fear showing. *Id.*

558 F.3d at 1062-63 (alterations and emphasis in original) (footnote omitted).

**[9]** We further explained that even where an applicant has shown membership in a disfavored group, he or she must still present some evidence of individualized risk.

Evidence of group discrimination will go part of the way toward meeting that bar— *how* far depending upon how "egregious" and pervasive the showing of group discrimination is, *see Mgoian* [*v. INS*], 184 F.3d [847,] . . . 1035 n.4 [(9th Cir. 1994)] — but, absent a "pattern or practice" of persecution, it can never go *all* the way. As we explained recently in the asylum context in *Lolong* . . . , *some* evidence of individualized risk is necessary for the petitioner to succeed.

*Id.* at 1065 (emphasis in original). The panel further noted that in *Lolong*, we upheld the BIA's determination that the applicant had failed to show an objectively well-founded fear of

future persecution because she had offered no evidence of her own individualized risk. *Id.* In remanding Wakkary's claim for withholding of removal[5] to the agency to determine whether he had adduced enough evidence of individual risk, we cited the IJ's mis-characterization of his past mistreatment as random encounters and noted Wakkary's position as a pastor with the Chinese-Christian community — "a position that makes him particularly visible and vulnerable to attack on account of his group membership." *Id.* at 1067.

   **[10]** The remaining question then is whether Halim has made a sufficient showing of a well-founded fear of future persecution under our disfavored group analysis to warrant relief or remand. We conclude that he has failed to make the minimal showing necessary to require that the agency reconsider its denial of relief. Our determination is based on (1) the relative weakness of the claim of disfavored status, (2) the lack of evidence of government approval of the alleged discrimination, and (3) Halim's minimal showing of individual risk.

   **[11]** Although we have recognized that Indonesia's ethnic Chinese minority is a "disfavored group," *see Sael*, 386 F.3d at 927, our subsequent opinions suggest that it is not severely disfavored. *See Lolong*, 484 F.3d 1180-81.[6] In *Wakkary*, we

---

   [5]The disfavored group analysis in *Wakkary* addressed withholding of removal, rather than asylum, because the agency had determined that Wakkary's application for asylum was untimely, and we remanded that issue to the agency to determine whether Wakkary had "applied for asylum within a 'reasonable period' as the regulations require." 558 F.3d at 1059.

   [6]We noted:

   We too are well aware of the long history of ethnic and religious strife in Indonesia. *See Sael*, 386 F.3d at 925-27. However, the record supports the BIA's conclusion that Lolong has not shown that the Indonesian government is unable or unwilling to control the perpetrators of this violence. As the BIA noted, the State

observed that "[w]e have never specified with any precision" when a discretionary pattern or practice existed so as to create a disfavored group. 558 F.3d at 1061. We concluded, however, that:

> the record . . . does not compel the conclusion that there exists a pattern or practice of persecution against Chinese and Christians in Indonesia. Although the record contains evidence of widespread anti-Chinese and anti-Christian *discrimination* that affects a very large number of individuals, and although it is clear that a certain portion of those individuals suffer treatment that rises to the level of persecution, the record does not establish that the situation in Indonesia is similar to the patterns or practices of persecution described in our prior case law.

*Id*. In *Hoxha*, we commented that although an applicant's "fear must be based on an individualized rather than generalized risk of persecution, the level of individualized targeting that he must show is inversely related to the degree of persecution directed toward [the disfavored group]." 319 F.3d at 1182 (citing *Kotasz*, 31 F.3d at 852-54). As Halim's showing of "disfavor" is relatively low, it only slightly offsets the need to show individual risk.

**[12]** One factor critical to both a showing of "disfavor" as well as individual targeting is the government's perspective.

---

Department's Country Reports ("Country Reports") indicated that "the government of Indonesia has [ ] shown its general commitment to freedom of religion and its lack of institutional discrimination against the ethnic Chinese minority." Beyond this general commitment, moreover, the record contains evidence suggesting that the government has taken concrete steps to suppress ethnic and religious violence and to encourage reconciliation between opposing groups.

*Id*. at 1180-81 (footnote omitted).

Here, the materials before the court indicate that the Indonesian government does not condone discrimination against ethnic Chinese. As noted, in *Lolong*, we observed that the Indonesian "government has taken concrete steps to suppress ethnic and religious violence and to encourage reconciliation between opposing groups." 484 F.3d at 1181. *See also Wakkary*, 558 F.3d at 1061. Moreover, in this case, Halim alleged only two incidents that involve the government. First, he alleges that in 1998, the army saved him from a beating by a mob. Second, he claims that in 1995 or 1996, he was arrested and detained for several days because he was Chinese, although the police alleged that the detention was based on the discovery of drugs in the car in which he was riding. The record in this case will not support a determination that the Indonesian government supports or condones persecution of its ethnic Chinese citizens.

**[13]** Finally, even accepting Halim's assertions as true, he has not made the minimal showing of individual targeting that would support a remand. In *Lolong*, we noted that in instances where relief had been granted, "the petitioner had presented some evidence that he or she faced a unique risk of persecution upon return that was distinct from the petitioner's mere membership in a disfavored group." 484 F.3d at 1180 n.5. Here, Halim has failed to offer any evidence that distinguishes his exposure from those of all other ethnic Chinese Indonesians. The only time that he was threatened as an adult was when he was stopped by chance by rioters. This could have happened to any ethnic Chinese Indonesian. After this incident, Halim continued to work and attend his university for another fifteen months without incident before he traveled to the United States. Moreover, he has family still living in Indonesia and he has not presented any evidence that they have been targeted. Halim has failed to indicate that he has been individually targeted, or is likely to be individually targeted, because of his Chinese ethnicity.

We recognize that given our limited role in reviewing orders of removal, we may not decide in the first instance an

issue entrusted to an administrative agency. *INS v. Ventura*, 537 U.S. 12, 16-17 (2002). However, there is no need for a remand here. First, we are affirming rather than reversing the agency. Second, in the decision denying relief, the IJ recognized that Halim was alleging a pattern of harassment and discrimination based on his ethnicity. Third, Halim has not made a prima facie showing that he might be entitled to relief under our disfavored group analysis. Thus, this is not a situation in which we determine that an applicant might be entitled to relief on the basis of an issue not decided by the agency. *See Wakkary*, 558 F.3d at 1068 (remanding because "the agency erred in refusing to consider the evidence regarding whether Wakkary belonged to a disfavored group in assessing the likelihood that he would face future persecution").

V

Although we appreciate that Halim may have suffered discrimination growing up in Indonesia, he has not made a compelling showing that: (1) the reported incidents of discrimination amount to persecution; (2) the incidents provide an objective basis for a well-founded fear of future persecution; or (3) he is a member of a disfavored group who has been individually targeted.[7] Accordingly, the petition for review is **DENIED**.

---

[7]Our holding that Halim has failed to make a compelling showing of persecution in support of his claim for asylum also requires that we deny his request for withholding of removal. *See Zehatye*, 453 F.3d at 1190 (noting that where an alien cannot establish eligibility for asylum, he will not qualify for withholding of removal, which imposes a heavier burden of proof). Also, to the extent that Halim has not waived any claim to relief under the CAT by failing to address such a claim in his brief, *see Bazuaye v. INS*, 79 F.3d 118, 120 (9th Cir. 1996) (holding that issues not raised in the opening brief are waived), his claim fails for lack of any evidence that he would be tortured if returned to Indonesia.

CUDAHY, Circuit Judge, concurring:

I concur in the majority opinion, but write separately to point out that under other circumstances, this matter should be remanded to the Board to consider the effect of *Wakkary*, *Lolong*, and *Sael*—all decided since the Board dealt with the present case. This remand would enable the Board to consider Halim's evidence of a pattern or practice of persecution against similarly situated individuals (disfavored group evidence) in relation to his individualized risk of persecution. Such a remand would be futile here, however, in light of the IJ's finding that Halim's testimony lacked credibility, leaving no basis for evidentiary analysis.

The majority refers to a "prima facie showing" to demonstrate entitlement to a remand to allow the Board to consider a disfavored group analysis. But I would emphasize the role of the Board, rather than our role, in pursuing the proper analysis. *See, e.g.*, *Gonzales v. Thomas*, 547 U.S. 183, 186-87 (2006); *INS v. Ventura*, 537 U.S. at 16; *Matthis v. INS*, 774 F.2d 965, 967 (9th Cir. 1995) (holding that the court cannot affirm the Board on a ground it did not articulate). Where, as here, remand would be futile because there is no credible evidence that could support findings that the petitioner faced an individualized risk of future persecution, we need not remand even though more recent caselaw has clarified the weight of pattern or practice evidence. I therefore join the majority opinion and would deny the petition for review.